**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| National Black Farmers Association | **JURY TRIAL DEMANDED** |
| Plaintiffs,<br>v. | Case No. |
| Monsanto Company | **COMPLAINT** |
| Defendants. | |

## COMPLAINT

COMES NOW Plaintiff National Black Farmers Association ("NBFA"), on behalf of its members, against Defendant Monsanto Company ("Monsanto"), alleging the following upon information and belief, except those allegations that pertain to NBFA and its members, which are based on personal knowledge:

## INTRODUCTION

Monsanto's Roundup® is a prevalent and yet highly dangerous product.  Although it has long been marketed as an entirely safe herbicide whose main benefit is that it can be indiscriminately sprayed on fields planted with Monsanto's "Roundup Ready" seeds, we now know that using Roundup® and its active ingredient, glyphosate, in this way causes cancer—including Non-Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma and/or Leukemia.  Bellwether plaintiffs have already litigated and prevailed on precisely such claims; other deserving plaintiffs are waiting to sue for their own damages; and certain class-action attorneys have already attempted to settle such claims, purporting to act on behalf of *all* other injured farmers.  But conspicuously absent from these damages actions and purported settlements is any effort to get Roundup® off the shelf and protect farmers from the harm that it causes.  The NBFA thus brings this action on behalf of its members, seeking an injunction that

will either require Monsanto to stop selling its dangerous product, or else substantially change its behavior so that Black farmers are adequately warned about and protected from the potentially fatal results of using Roundup® in just the way that Monsanto has told (or, really, forced) them to do.

NBFA is perfectly suited to litigate this action for injunctive relief.  A huge proportion of NBFA's members have been exposed to and potentially injured by Roundup®.  And until now, those members did not know of any association between exposure to Roundup® and an increased risk of developing these listed above, even well after the International Agency for Research on Cancer, an agency of the World Health Organization, first published its evaluation of glyphosate. That is because Monsanto has waged a campaign of misinformation espousing the safety of Roundup® even as it knew there was evidence to the contrary.  And because NBFA is an on-ground farm organization—that is in fact run entirely by Black farmers—they are only too familiar with how Monsanto has misled its members, and what it would take to stop its harms from continuing to propagate.

Indeed, the harms caused by Roundup® are felt acutely by NBFA's members: largely rural Black farmers who frequently have limited internet connectivity and/or literacy, and are dependent on their local seed stores for product and information.  Utterly unaware of the danger, these farmers have been all-but forced into purchasing Monsanto's Roundup Ready® seeds and thus Roundup® products containing glyphosate by Monsanto's aggressive business practices.  Over the course of the last several decades, Monsanto has purchased local, conventional seed sellers and then removed their products from the market, making its own "Roundup Ready®" seeds the only option available to rural Black farmers.  And to justify the huge, annual financial investment required to

buy Roundup Ready® seeds, these farmers were forced in turn into purchasing and using Roundup® herbicides containing glyphosate.

Compounding the issue, weeds have naturally become more resistant to Roundup® over the course of the last few decades as well, and now require the application of multiple chemicals (including dangerous chemicals like 2,4-D, a component of Agent Orange) to ensure the same yield. However, Defendant did not provide the safety training necessary to use these products, meaning that Black farmers have, for decades, been exposed to dangerous chemicals that are becoming more and more dangerous with time. At the same time, Roundup Ready® seeds are more expensive than conventional seeds, and must be replanted annually, whereas conventional seeds can be reused multiple times. This creates even further exposure to the dangerous chemicals sold by Monsanto and its parent company Bayer—again, all without proper safety training.

In short, Monsanto has created a vicious cycle in which rural Black farmers have been forced into using Roundup Ready® seeds developed by Defendant, which require the use of dangerous chemicals without warnings—including glyphosate-containing Roundup® products— that must then be made even stronger (and more dangerous) over time. Having bred super-weeds by using Monsanto's products and lost access to affordable conventional seed—and uniquely deprived of the resources to adopt alternative practices by decades of outright and structural racism in the administration of farm programs—NBFA's members only end up exposing themselves to more and more carcinogens like glyphosate, and that leads, in turn, to lethal cancers that only begin to cause symptoms decades after exposure. The only way to break this cycle is to force Monsanto to stop selling its carcinogenic product. And that requires the injunctive relief that NBFA has brought this action to pursue.

## I.  THE PARTIES

### Plaintiff NBFA

1.     The National Black Farmers Association is a non-profit association that represents Black and minority farmers on various issues, including, "civil rights, land retention, access to public and private loans, education and agricultural training, and rural economic development." The association has a long history, going back to 1995, of challenging discriminatory conduct by the U.S. Department of Agriculture and of pursuing litigation to that end on behalf of its members. Accordingly, NBFA's efforts have been pivotal in pushing Congress to pass legislation compensating Black farmers for past harms.[1]

2.     NBFA was founded in 1995 by John W. Boyd, Jr., a fourth-generation Black farmer from Baskerville, Virginia, in the wake of repeated instances of discrimination.[2]  Since then, NBFA has been at the forefront of challenging discriminatory conduct by the U.S. Department of Agriculture.  *See supra* note 1.  Indeed, its claims of discriminatory loan and subsidy distribution have now been acknowledged by the USDA.  *Id.*  Black farmers—who are just as deserving of government assistance as white farmers—have been denied access because of their race.  And the denial of aid has led to sweeping bankruptcies and foreclosures among Black farmers, with structural effects that continue to this day.[3]

---

[1] *See* Nat'l Black Farmers Assoc., https://www.nationalblackfarmersassociation.org/about_us (last visited Aug. 22, 2020).

[2] *See* Summer Sewell, *There Were Nearly a Million Black Farmers in 1920. Why Have They Disappeared?*, The Guardian (Apr. 29, 2019), https://www.theguardian.com/environment/2019/apr/29/why-have-americas-black-farmers-disappeared.

[3] *See* Congressional testimony of John W. Boyd, Jr., Founder and President, NBFA, *available at* https://www.congress.gov/116/meeting/house/109679/witnesses/HHRG-116-BA10-Wstate-BoydJ-20190619-U1.pdf.

3.     Following a successful fight to redress the historic discrimination against Black farmers, which culminated in congressional legislation in 2010, the NBFA continues today to advocate for Black farmers and fight discrimination to ensure that its members receive the same aid and credit that white farmers do.  The most recent example is NBFA's effort to get farmers relief following the administration's trade tariffs.  *See supra* note 3.  The organization also facilitates educational events for its members, helping them to navigate suits and settlements.  *See supra* note 1.

4.     NBFA's members include "full-time farmers, part-time farmers, land and timber owners and many concerned citizens."  *See supra* note 3.  The NBFA is comprised of over 100,000 members across 42 states.  *See id.*  Over the past century, Black farm ownership has seen startling declines.  Studies show that the number of farms operated by Black farmers has been dramatically reduced, from nearly one million in 1920 to less than fifty-thousand in 2012.  *See supra* note 1.  Today, only about 1.3% of the country's farmers are Black, and they own a mere 0.52% of America's farmland.  *See supra* note 2.  Scholars attribute this decline in part to rampant discrimination.[4]  While USDA has calculated a recent uptick in the number of Black farmers, such numbers do not eliminate years of discriminatory treatment nor obviate continued discrimination today.  *See id.*  Further, the accuracy of these increases has been disputed.[5]

---

[4] *See, e.g.*, Pete Daniel, Dispossession: Discrimination Against African American Famers in the Age of Civil Rights (2015); Zoe Willingham, *Progressive Governance Can Turn the Tide for Black Famers*, Ctr. for Am. Progress (Apr. 3, 2019), https://www.americanprogress.org/issues/economy/reports/2019/04/03/467892/progressive-governance-can-turn-tide-black-farmers/.

[5] Nathan Rosenberg & Bryce Wilson Stucki, *How USDA Distorted Date to Conceal Decades of Discrimination Against Black Farmers*, The Counter (June 26, 2019), https://thecounter.org/usda-black-farmers-discrimination-tom-vilsack-reparations-civil-rights/.

5.      NBFA is a critical player in ensuring that the voices of its members are heard, and has a long history of representing members in litigation.  The vast majority of NBFA members are rural; many are low literacy; and many more have no reliable connection to the internet or ready sources of information on critical and complex topics like those presented in this suit.  NBFA holds regular meetings focused on practical farm issues, regularly communicates with its members through these (and other) outlets, and is thus a vital source of information and voice for its members.

## Defendant

6.      Defendant Monsanto Company is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

7.      At all times relevant to this petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

8.      In September 2016, Monsanto was acquired by Bayer, a German chemicals conglomerate.

## II.   ORGANIZATIONAL STANDING

An association like NBFA has standing on behalf of its members when (a) its members would otherwise have standing to sue in their own right, (b) the interests it seeks to protect are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  As to the first element, only one member need have standing to sue in his or her own right for the organization to have standing.  *Id.* at 342.

### NBFA members have standing to sue in their own right

9.      NBFA has thousands of members who have used Roundup® products containing glyphosate for decades—including Founder and President John Boyd.  Some of those members

have already been injured by the use of Roundup® products, and others have legitimate reasons to fear (and believe) that they will develop symptoms, and thus require immediate medical monitoring. Both kinds of present injuries separately and independently provide standing for members to seek relief against Monsanto, including injunctive relief. Moreover, NBFA members who have not yet become sick will be more likely to develop cancers if they are unable to enjoin Monsanto's continued marketing of an unsafe product that does not adequately warn farmers about the dangers of its use, or instruct on how to use it safely.

**Interests protected by this suit are germane to NBFA's purpose**

10.     Protection of farmers like those injured by Roundup® is NBFA's core purpose. Moreover, NBFA's members are particularly vulnerable to Monsanto's predatory practices. Before Roundup®, almost every Black farmer—many of whom are members of NBFA—was a soybean or grain farmer using conventional seeds. But Black farmers have been forced away from conventional seeds over recent decades because Monsanto slowly acquired most other seed companies and bought up all of the shelf space from local seed stores, crowding out conventional varieties. The only remaining option was thus to buy the Roundup Ready® seeds developed by Monsanto, which, in turn, practically require the use of glyphosate-containing Roundup® products in order to justify the enormous premium these genetically modified seeds command. The overwhelming majority of Black farmers are thus now farming soybeans and grain grown from Monsanto's Roundup Ready® seed, and using the products at issue here to do so.

11.     NBFA, meanwhile, has opposed Monsanto's efforts to consolidate the market for years, and have sought to prevent Monsanto from taking away its members' freedom to farm through conventional seeds and farming methods. Because they are smaller, more local, and more rural, Black farmers tend to be overwhelmingly dependent on local seed stores, and Monsanto's mergers thus have a disproportionate effect on NBFA members. NBFA thus publicly and loudly

opposed Bayer's purchase of Monsanto, which allowed the merged company to further corner the market, and predictably led to Black farmers depending even more on Monsanto's Roundup® products.

12.     The cycle is also self-perpetuating, and becomes more dangerous to rural Black farmers like NBFA's members every year.  Now that they have been forced into using Roundup Ready® seeds requiring Roundup® products, the weeds that Roundup® is intended to protect against—namely Pigweed and broadleaf species—have become more and more resistant.  Thus, Black farmers are increasingly exposed not solely to Roundup® itself, as resistant weeds require an increase in the number of applications, but also to other dangerous chemicals such as 2,4D—a component of Agent Orange.

13.     Finally, in part due to long-documented disparities in literacy and education rates, Black farmers have been particularly harmed by the lack of a plain, clear warning (like those on cigarette labels) on Roundup® products, compounded by the fact that Monsanto has lied to them for decades, assuring them that Roundup® products are safe.  Thus, for decades, NBFA's members have used Roundup® products without any training on how to use it safely, despite scientific evidence that glyphosate is linked to cancer.

14.     NBFA played a leading role in litigation related to discrimination against Black farmers in USDA programs, and the protection and advocacy for its members' interests in farm-related litigation is thus within NBFA's core purpose.  The issues this lawsuit will present could not be more clearly within the scope of NBFA's work.

**Neither the claim asserted nor relief requested requires individual members' participation**

15.     Injunctive relief of the kind at issue here is ordinarily sought on behalf of all similarly situated individuals, *see, e.g.*, Fed. R. Civ. P. 23(b)(2), and does not typically require the

participation of individual members.  Whether Monsanto can continue to market Roundup® and the warnings that are necessary to do so are naturally suited to representative litigation, and an organization that represents particularly vulnerable farming constituencies is thus ideally suited to prosecute this case.

### III.   PERSONAL JURISDICTION AND VENUE

19.     Venue is proper in this court.  Under the federal venue statute, a civil action may be brought in the "judicial district in which" the "defendant resides," 28 U.S.C. §1391(b)(1), and also the "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated," *id.* §1291(b)(2).  Venue is proper under either provision.

20.     At all relevant times, Monsanto, a wholly owned subsidiary of Bayer Aktiengesellschaft ("Bayer AG"), has had its principal place of business in St. Louis, Missouri, and is therefore amenable to suit here.  Monsanto is therefore "at home" in Missouri, and this court has general personal jurisdiction over Monsanto.  *Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915, 924 (2011); *see also* Fed. R. Civ. P. 4(k)(1)(A) (providing that "serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant: (A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located").

21.     Moreover, at all relevant times, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, and packaging and Monsanto was in the business of marketing, promoting, and/or advertising Roundup® products in St. Louis, Missouri.  There is thus specific jurisdiction as well.

## IV.    **SUBJECT-MATTER JURISDICTION**

22.     The National Black Farmers Association is a 501(c)(3) nonprofit organization and Virginia nonstock corporation with its registered home office in Baskerville, Virginia.[6]

23.     Bayer AG is incorporated in the Federal Republic of Germany with its principal place of business in Leverkusen, Germany.

24.     Monsanto Co. is a wholly-owned subsidiary of Bayer AG, and has its principal place of business in St. Louis, Missouri.[7]

25.     The court has subject matter jurisdiction under 28 U.S.C. §1332(a)(1).  Monsanto is a citizen of Missouri under 28 U.S.C. §1332(c)(1).  NBFA, as a Virginia nonprofit organization, is a citizen of Virginia under 28 U.S.C. §1332(c)(1).  The parties therefore have complete diversity of citizenship.  *Lincoln Property Co. v. Roche*, 546 U.S. 81, 89 (2005).

26.     NBFA's requested relief also meets the $75,000 amount-in-controversy requirement of 28 U.S.C. §1332.  When there is a "suit for declaratory or injunctive relief, the amount in controversy is the value to the plaintiff of the right that is in issue." *Usery v. Anadarko Petroleum Corp.*, 606 F.3d 1017, 1018 (8th Cir. 2010).  Under this standard, the measurement of value is the "actual value of the object of the suit." *Id.*  NBFA requests that Monsanto be enjoined from selling Roundup® products in the stream of commerce. *See infra* ¶132.  As Monsanto sells millions of dollars of Roundup® products nationwide, the requested injunction meets the amount-in-controversy requirement of 28 U.S.C. §1332.

## V.    **FACTS**

---

[6] https://cis.scc.virginia.gov/EntitySearch/BusinessInformation?businessId=190627&source=FromEntityResult&isSeries=False

[7] *See, e.g.*, https://www.investor.bayer.de/en/bayer-group/ueberblick/subsidiaries/.

27.     In 1970, Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually.  That number grew to 185 million pounds by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.

28.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.  It is the world's leading producer of glyphosate.  But as of 2009, Monsanto was *also* the world's leading producer of seeds, accounting for 27% of the world seed market.

29.     The majority of these seeds are Monsanto's Roundup Ready® brand.  Such seeds have been genetically modified to resist the effects of glyphosate.  This permits farmers to indiscriminately spray their fields with huge amounts of glyphosate to control weeds without endangering the growing crops.  In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

30.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.  It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

31.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to

11

glyphosate since 2001.   The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans.   The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

32.     Nevertheless, Monsanto has consistently represented that Roundup® is safe for humans and the environment.   Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to humans or the environment.

33.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.   Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers.

34.     These and other agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless.   In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed Roundup®'s dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.   And this disinformation campaign had a disproportionate effect on Black farmers, who have become particularly dependent on Monsanto's seeds and herbicides for the reasons discussed above.

**Scientific fraud underlying the marketing and sale of glyphosate/Roundup®**

35.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.   After pressure from Monsanto, the EPA changed its classification to evidence of non-

carcinogenicity in humans (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

36.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

37.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

38.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

39.     Three top executives of IBT were convicted of fraud in 1983.

40.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

41.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

**Monsanto has known for decades that it falsely advertises the safety of Roundup®**

42.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)   Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)   And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)   Roundup biodegrades into naturally occurring elements.

d)   Remember that versatile Roundup herbicide stays where you put it.  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)   This non-residual herbicide will not wash or leach in the soil.  It ... stays where you apply it.

f)   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching.  Then, soon after application, soil microorganisms biodegrade Accord into natural products.

14

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of "practically non-toxic" as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

43.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. ***

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable ***

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. ***

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

15

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

44. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

45. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

46. In 2018, Dewayne Johnson—a black public-school groundskeeper tasked with regularly using Roundup® as part of his job—became the first person to take Monsanto to trial before a jury on allegations that Roundup® caused his non-Hodgkin lymphoma.[8] A unanimous jury agreed, handing down a verdict in Johnson's favor and awarding him $289 million in compensatory and punitive damages. *Id.* The jury found that Roundup® products are a "substantial danger" to people and the company failed to warn consumers of the risks, and that Monsanto had acted with "malice or oppression" in its conduct.[9] On cross-appeal, the court affirmed that there was "abundant—and certainly substantial—evidence" to support the jury's finding "that glyphosate, together with the other ingredients in Roundup products, caused" Johnson's "cancer."[10] The court also concluded that there was "substantial evidence" to support

---

[8] Sam Levin, *The Man Who Beat Monsanto: "They Have to Pay for Not Being Honest"*, The Guardian (Sep. 26, 2028), https://www.theguardian.com/business/2018/sep/25/monsanto-dewayne-johnson-cancer-verdict.

[9] *See* Verdict Form, *Johnson v. Monsanto*, No. CGC-160559128 (Cal. Super. Ct., Cty. of S.F., Aug. 10 2018), *available at* https://www.baumhedlundlaw.com/pdf/monsanto-documents/johnson-trial/Johnson-vs-Monsanto-Verdict-Form.pdf.

[10] *Johnson v. Monsanto Co.*, -- Cal. Rptr. 3d --, 2020 WL 4782728 (Cal. Ct. App. Aug. 18, 2020) (also denying the petitions for rehearing).

the jury's finding "that Monsanto acted with a willful and conscious disregard of others' safety." *Id.* Although the court ultimately reduced the compensatory and punitive damages awards, they still amounted to over $20.5 million for Johnson. *Id.*

47.     In 2019, another jury ruled in favor of Edwin Hardeman on similar claims against Monsanto for causing his non-Hodgkin lymphoma—the first case of its kind in federal court.[11] The jury awarded Hardeman $80 million in damages—which included about $75 million in punitive damages for Monsanto's conduct—after unanimously finding that Roundup® was a "substantial factor" in causing his Hardeman's cancer.  The jury unanimously ruled that Roundup® is "defective," lacked sufficient cancer warnings, and that Monsanto was negligent in failing to warn Hardeman of the NHL risk.[12]  This case is currently on appeal before the Ninth Circuit, with oral argument scheduled for October 23, 2020.[13]

**Classifications and assessments of glyphosate**

48.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.  These evaluations are performed by panels of international

---

[11] Sam Levin, *The Family That Took On Monsanto: "They Should've Been With Us in the Chemo Ward"*, The Guardian (Apr. 10, 2019), https://www.theguardian.com/business/2019/apr/10/edwin-hardeman-monsanto-trial-interview.

[12] Sam Levin, *Monsanto Found Liable for California Man's Cancer and Ordered to Pay $80m In Damages*, The Guardian (Mar. 27, 2019), https://www.theguardian.com/business/2019/mar/27/monsanto-trial-verdict-cancer-jury.

[13] *Hardeman v. Monsanto Co.*, No. 19-16636 (9th Cir.).

experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

49.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

50.     In March 2015, IARC reassessed glyphosate.  The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

51.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112.  It relied on publicly available studies involving the following exposure groups: farmers and tree nursery workers occupationally exposed in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

52.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

53.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

54.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma.  A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

55.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.   Soil microbes degrade glyphosate to aminomethylphosphoric acid ("AMPA").   Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

56.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

57.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.  While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia ("HCL"), and Chronic Lymphocytic Leukemia ("CLL"), in addition to several other cancers.

**Recent bans on Roundup®/glyphosate in other countries**

58.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow.  The

Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

59.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

60.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

61.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

62.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

63.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

64.     All in all, the following countries have now issued outright bans on glyphosate, imposed restrictions, or have issued statements of intention to ban or restrict glyphosate-based herbicides, including Roundup®, over health concerns and the ongoing Roundup cancer litigation:

Argentina, Australia, Austria, Bahrain, Belgium, Bermuda, Brazil, Canada, Columbia, Costa Rica, Czech Republic, Denmark, El Salvador, Fiji, France, German, Greece, India, Italy, Kuwait, Luxembourg, Malawi, Malta, Mexico, Netherlands, New Zealand, Oman, Portugal, Qatar, St. Vincent and the Grenadines, Saudi Arabia, Scotland, Slovenia, Spain, Sri Lanka, Sweden, Switzerland, Thailand, United Arab Emirates, United Kingdom, and Vietnam.[14]

## Monsanto fails to change its behavior in the United States

65.     Even as of July 2020, Defendant continued to represent to the public that "Glyphosate is one of the most studied herbicides in the world – and, like all crop protection products, it is subject to rigorous testing and oversight by regulatory authorities. There is an extensive body of research on glyphosate and glyphosate-based herbicides, including more than 800 scientific studies submitted to U.S., submitted to U.S. or other worldwide regulators in connection with the registration process, that confirm that glyphosate and our glyphosate-based formulated products can be used safely and do not cause cancer."[15]

66.     In fact, Defendant has *increased* its advertising of glyphosate-based products in the wake of all of this evidence.[16]   In 2020 alone, Defendant has spent over $8,500,000 to advertise directly to consumers in an attempt to sell them glyphosate-based products.

67.     It is therefore clear that, absent an order from a court, Monsanto will continue to sell its carcinogenic products while affirmatively representing that they are safe when they are not.

---

[14] *See* Where Is Glyphosate Banned?, https://www.baumhedlundlaw.com/toxic-tort-law/monsanto-roundup-lawsuit/where-is-glyphosate-banned/ (last visited Aug. 24, 2020).

[15] Bayer Website Common Questions - Is Glyphosate Safe? at https://www.bayer.com/en/is-glyphosate-safe.aspx (last accessed July 23, 2020).

[16] https://www.wsj.com/articles/roundup-sellers-boost-advertising-as-lawsuits-mount-for-weedkiller-11556738038 (last accessed Aug. 19, 2020).

Monsanto's ongoing conduct is certain to cause ongoing harm to NBFA's members, who are likely to believe that Roundup® is safe precisely because Monsanto continues to sell it, and will only be persuaded otherwise by highly direct and affirmative warnings.

68.     In addition, so long as Monsanto remains able to market Roundup®, it will retain an incentive to deprive NBFA members of access to conventional seed, and to thereby coerce NBFA members into using Roundup®, even if they do become aware of its risks.  Conversely, removing the carcinogenic product from the shelves will limit the advantages of Roundup Ready® seeds, and thereby restore Black farmers' badly needed access to conventional, non-genetically-modified seed and farming methods.

## VI.    CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT)
### (AGAINST MONSANTO)

69.     NBFA incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

70.     NBFA brings this strict liability claim against Monsanto for defective design.

71.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including NBFA's members, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Monsanto.  At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by NBFA's members, as described above.

72.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, NBFA's members.

73.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including NBFA's members, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

74.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

75.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

76.     At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

77.     Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and

marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)      When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)      When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)      When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)      Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e)      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)      At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)      Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h)      Monsanto could have employed safer alternative designs and formulations.

78.     NBFA's members were exposed to Roundup® products in the course of their work, as described above, without knowledge of their dangerous characteristics.

79.     At all times relevant to this litigation, NBFA's members used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

80.     NBFA's members could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

81.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous.  Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

82.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

83.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the NBFA's members.

84.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to NBFA's members.

85.     The defects in Roundup® products caused or contributed to NBFA's members grave injuries, and, but for Monsanto's misconduct and omissions, NBFA's members would not have sustained their injuries.

86.     Monsanto's conduct, as described above, was reckless.  Monsanto risked the lives of consumers and users of its products, including NBFA's members, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public.  Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public.

87.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, NBFA's members have suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, NBFA prays for entry of an injunctive order against Monsanto as set forth in the prayer for relief below, because NBFA will succeed on the merits; its members will suffer irreparable harm in the absence of an injunction; and the balance of equities and public interest overwhelmingly favor enjoining Monsanto from continuing its current practices respecting the sale of Roundup®.  *See Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN)
## (AGAINST MONSANTO)

88.     NBFA incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

89.     NBFA brings this strict liability claim against Monsanto for failure to warn.

90.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including NBFA's members, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Monsanto.

91.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including NBFA's members, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

92.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks.  Monsanto had a continuing duty to warn NBFA's members of the dangers associated with Roundup® use and exposure.  Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

93.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

94.     At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including NBFA's members.

95.     Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.  The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as NBFA's members.

96.     These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers reasonably foreseeable users of the risks of exposure to its products.  Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

97.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including NBFA's members, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

98.     NBFA's members were exposed to Roundup® products in the course of their employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

99.     At all times relevant to this litigation, NBFA's members used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

100.    NBFA's members could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of their exposure.   NBFA's members relied upon the skill, superior knowledge, and judgment of Monsanto.

101.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

102.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as NBFA's members to utilize the products safely and with adequate protection.   Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

103.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of NBFA's members' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

104.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by NBFA's members in their work.

105.    Monsanto is liable to NBFA's members for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

106.    The defects in Roundup® products caused or contributed to cause NBFA's members' injuries, and, but for this misconduct and omissions, NBFA's members would not have sustained their injuries.

107.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, NBFA's members could have avoided the risk of developing injuries as alleged herein.

108.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, NBFA's members have suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, NBFA prays for entry of an injunctive order against Monsanto as set forth in the prayer for relief below, because NBFA will succeed on the merits; its members will suffer irreparable harm in the absence of an injunction; and the balance of equities and public interest

overwhelmingly favor enjoining Monsanto from continuing its current practices respecting the sale of Roundup®.  *See Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

**COUNT III**
**UNLAWFUL PRACTICES IN TRADE AND COMMERCE**
**UNDER Mo. Rev. Stat. §407.020**
**(AGAINST MONSANTO)**

109.    NBFA incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

110.    At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

111.    At all relevant times, Defendant, through its labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use.

112.    At all relevant times, Defendant also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup® products in trade or commerce. In particular, Defendant failed to disclose to the public that Roundup® is unsafe and poses serious health hazards, particularly Non-Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma, and/or Leukemia. Defendant was aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. Defendant's failure to state material facts about Roundup® constitutes a violation of Mo. Rev. Stat. §407.020.

113.    At all relevant times, NBFA's members were deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television

commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup®.

114.    At all relevant times, NBFA's members acted in reasonable reliance upon Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, NBFA's members would not have purchased Roundup® and/or would have protected themselves from exposure to Roundup®.

115.    As a direct and proximate result of Defendant's unlawful trade practices, NBFA's members developed Non-Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma, and/or Leukemia, and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

WHEREFORE, NBFA prays for entry of an injunctive order against Monsanto as set forth in the prayer for relief below, because NBFA will succeed on the merits; its members will suffer irreparable harm in the absence of an injunction; and the balance of equities and public interest overwhelmingly favor enjoining Monsanto from continuing its current practices respecting the sale of Roundup®.  *See Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

## COUNT IV
## NEGLIGENCE
## (AGAINST MONSANTO)

116.    NBFA incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

117.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by NBFA's members.

118.   At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

119.   At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products.  Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

120.   At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

121.   Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with NBFA's members' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including NBFA's members.

122.   Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

123.   As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply,

promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

124.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

125.    Monsanto was negligent in the following respects:

a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

34

d)      Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e)      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f)      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g)      Failing to disclose to NBFA's members, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h)      Failing to warn NBFA's members, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to NBFA's members and other consumers;

i)      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j)      Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k)      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l)       Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m)      Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n)       Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

126.    Monsanto knew and/or should have known that it was foreseeable that consumers such as NBFA's members would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

127.    NBFA's members did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

128.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that NBFA's members suffered, as described herein.

129.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including NBFA's members, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including NBFA's members. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

130.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, NBFA's members have suffered severe and permanent physical and emotional injuries. NBFA's members have endured pain and suffering and have suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, NBFA prays for entry of an injunctive order against Monsanto as set forth in the prayer for relief below, because NBFA will succeed on the merits; its members will suffer irreparable harm in the absence of an injunction; and the balance of equities and public interest overwhelmingly favor enjoining Monsanto from continuing its current practices respecting the sale of Roundup®.  *See Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

## JURY DEMAND

131.    NBFA hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

132.    NBFA incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

For the foregoing reasons, NBFA respectfully requests entry of an ORDER:

a.    ENJOINING Monsanto from continuing to market and sell Roundup® products in the stream of commerce;

b.    ENJOINING Monsanto to remove Roundup® products from the stream of commerce; and

c.    any other relief the Court may deem just and proper.

Or, in the alternative,

d. ENJOINING Monsanto to include plain, visible warnings (like those on cigarette products) on all Roundup® products, stating that Roundup® has been found to cause NHL, Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma, and/or Leukemia; and

e. any other relief the Court may deem just and proper.

Respectfully submitted,

NAPOLI SHKOLNIK, PLLC

*/s/ Christopher L. Schnieders*
Christopher L. Schnieders, MO # 57725
6731 W. 121st Street, Suite 201
Overland Park, KS 66209
Telephone: 913-246-3860
Fax: 913-312-5841
cschnieders@napolilaw.com

BEN CRUMP LAW

Benjamin L. Crump
    *Motion for admission pro hac vice to be filed*
FL Bar #72583
TN Bar #038054
Washington D.C. Bar #1552623
122 S. Calhoun St.
Tallahassee, FL 32301
850-888-4140
Court@bencrump.com

GOLDSTEIN & RUSSELL, P.C.

Thomas C. Goldstein, 458365(DC)
    *Motion for admission pro hac vice to be filed*
Eric F. Citron, 1001069(DC)
    *Motion for admission pro hac vice to be filed*
7475 Wisconsin Avenue, Suite 850
Bethesda, MD 20814
Telephone: 202-362-0636
Fax: 866-574-2033
tgoldstein@goldsteinrussell.com
ecitron@goldsteinrussell.com